## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | | |
|---|---|---|---|
| SIOBHAN JAMES, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | 1:20CV134 | |
| | ) | | |
| PRS PARTNERS, LLC, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendant's "Motion to Compel Arbitration" (Docket Entry 16 (the "Arbitration Motion"); see also Docket Entry 27 (referring case to undersigned United States Magistrate Judge for disposition on consent of parties, pursuant to 28 U.S.C. § 636(c)). For the reasons that follow, the Court will deny the Arbitration Motion without prejudice.

## BACKGROUND

Alleging violations of the Fair Labor Standards Act ("FLSA") and the North Carolina Wage and Hour Act ("NCWHA"), Siobhan James ("James"), on behalf of herself and a class of similarly situated individuals, initiated this lawsuit against PRS Partners, LLC ("PRS"). (See Docket Entry 1 (the "Complaint"), ¶¶ 1-2.) On James's own behalf, the Complaint further asserts several common-law claims against PRS. (Id., ¶ 6.) The Complaint relies on the FLSA allegations to establish federal-question subject-matter

jurisdiction; supplemental jurisdiction covers the remaining state-law claims.  (Id., ¶¶ 7, 11.)

According to the Complaint, from approximately July 2016 until January 2018, James worked for PRS at "Capital Cabaret Gentlemen's Club in Morrisville, North Carolina."  (Id., ¶¶ 14, 15.)  PRS allegedly misclassified James as an independent contractor (rather than an employee) and failed to pay proper wages for hours worked.  (See id., ¶¶ 23-53.)  This alleged conduct forms the basis of the FLSA and NCWHA claims.  (See id., ¶¶ 89-121.)  As concerns the common-law claims, the Complaint alleges that Tim Koller, a manager at the site where James worked, attacked James during one of her shifts.  (See id., ¶¶ 69-88.)  Based on this incident, the Complaint charges PRS with negligent employment, supervision, and retention; assault; battery; intentional infliction of emotional distress; negligent infliction of emotional distress; and wrongful discharge.  (See id., ¶¶ 122-55.)

Instead of answering the Complaint, PRS filed the Arbitration Motion, requesting an order compelling arbitration of "every Count alleged against [PRS] in this action."  (Docket Entry 16 at 1-2, 4.)  As grounds for such an order, the Arbitration Motion invokes the Federal Arbitration Act (the "FAA").  (See id. at 3-4.)[1]  James

_____

1  Although the Arbitration Motion also references Federal Rule of Civil Procedure 12(b)(3) (see Docket Entry 16 at 3), "a party may not seek to enforce a forum selection clause by moving to dismiss for improper venue."  BAE Sys. Tech. Sol. & Servs. v. Republic of Korea's Def. Acquisition Program Admin., 884 F.3d 463,

2

opposed the Arbitration Motion, arguing that PRS "has no right . . . to compel arbitration of Plaintiff's claims" (Docket Entry 17 at 6), because she and PRS did not sign an agreement containing an arbitration clause (see id. at 3-6). James also raised a challenge to the location of the arbitration PRS demanded. (See id. at 5.) PRS replied, contending that the location conflict did not preclude arbitration and identifying itself as the entity bound by (and authorized to enforce) an agreement to arbitrate with James. (See Docket Entry 22 at 2-3.)

As relevant to the Arbitration Motion, the record[2] reflects the following:

On August 4, 2015, James signed an arbitration agreement (the "Agreement") with "Cap Cab" (the "Company"),[3] in which James promised "as a condition of providing services or continuing to

_____

470 n.4 (4th Cir. 2018) (citing Atlantic Marine Constr. Co. v. United States Dist. Ct., 571 U.S. 49, 59-61 (2013)); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause[.]").

2    The Court may look beyond the pleadings because the standard applicable to motions to compel arbitration "is akin to the burden on summary judgment." Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015).

3    The first paragraph of the mostly typewritten document includes spaces for signatories to fill in their names and the date. (See Docket Entry 16-1 at 2.) According to that first paragraph, James and the Company signed the Agreement on August 4, 2013. (Id.) One signatory handwrote the "4" day of "August" next to the typewritten year, 2013. (Id.) In contrast, the signature lines for James and the Company at the end of the Agreement bear the date August 4, 2015. (See id. at 4.)

provide services to Company . . . to arbitrate 'covered claims,' as . . . defined in [the] Agreement, on an individual basis." (Docket Entry 16-1 at 2, 4.)  Under the Agreement,

> "covered claims" include . . . all claims alleging discrimination, harassment, retaliation, and/or related to [James's] compensation by Company for the services [she] performs, and specifically including any claim or cause of action alleging [James] is an employee of Company and/or was improperly or insufficiently paid wages under the [FLSA] or any state or local wage and hour law, regardless of whether the covered claims arose or accrued prior or subsequent to [James] entering into th[e] Agreement.

(Id. at 2.)  The Agreement prohibits James and the Company from "lead[ing], join[ing], or serv[ing] as a member of a class or group of persons bringing such 'covered claims.'" (Id.; see also id. at 3 (providing that "the arbitrator . . . shall not consolidate claims . . . into one proceeding . . . or hear an arbitration as a class or collective action").)

As to logistics, the Agreement states that arbitration shall occur "in Charlotte, North Carolina, under the [FAA]." (Id. at 2.) The Agreement elsewhere identifies the arbitration locale as "Charlotte, North Carolina within twenty-five (25) miles of the last place [James] provided services to Company, unless the parties agree otherwise." (Id. at 3.)[4] "[T]he JAMS Employment Arbitration Rules & Procedures" ("JAMS Rules") shall govern the arbitration,

---

    4    James's response characterizes this provision as problematic because she worked for PRS in Morrisville, North Carolina, more than 150 miles away from Charlotte, North Carolina. (Docket Entry 17 at 5.)

4

except that the Agreement controls in case of any conflict with the JAMS Rules.  (Id.)

The final paragraph of the Agreement contains an acknowledgment that "[James] received th[e] Agreement, read th[e] Agreement, understands th[e] Agreement, and agrees to [its] terms." (Id. at 4.)  Above the signature line designated for "Entertainer" appears the printed name "S. James."  (Id.)  On behalf of the Company, the Agreement bears the (indecipherable) initials of an unidentified signatory.  (Id.)

That same day, James signed another paper acknowledging her receipt and understanding of "the Entertainer Orientation Packet." (Id. at 5 (the "Orientation Acknowledgment").)  James's cursive signature on the Orientation Acknowledgment differs from her printed signature on the Agreement.  (Compare id., with id. at 4.)[5] The "House Signature" on the Orientation Acknowledgment, also dated August 4, 2015, closely resembles the initials indicating assent by the Company to the Agreement.  (Compare id. at 5, with id. at 4.)

## DISCUSSION

### I. Arbitration Motion

### A. Legal Standards

"[The FAA] provides for the enforcement of agreements in which the parties have agreed to arbitration."  Whiteside v. Teltech

---

5  James's response highlights the difference between the two signatures but stops short of denying that she signed the Agreement.  (See Docket Entry 17 at 4.)

<u>Corp.</u>, 940 F.2d 99, 101 (4th Cir. 1991) (emphasis omitted).  Under Section 4 of the FAA, "upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the [C]ourt shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . .  [However, i]f the making of the arbitration agreement . . . be in issue, the [C]ourt shall proceed summarily to the trial thereof."  9 U.S.C. § 4.  "Compelling arbitration is appropriate under the FAA only when there is 'a judicial conclusion' that there is a validly formed, express agreement to arbitrate."  <u>Dillon v. BMO Harris Bank, N.A.</u>, 173 F. Supp. 3d 258, 263 (M.D.N.C. 2016) (quoting <u>Granite Rock Co. v. International Bhd. of Teamsters</u>, 561 U.S. 287, 303 (2010)), <u>appeal dismissed sub nom. Dillon v. Bay Cities Bank</u>, No. 16-1373 (4th Cir. Apr. 5, 2016) (unpublished).

"In determining whether the parties executed a valid agreement to arbitrate, courts generally apply ordinary state-law principles that govern the formation of contracts."  <u>Sydnor v. Conseco Fin. Servicing Corp.</u>, 252 F.3d 302, 305 (4th Cir. 2001).  In this case, the Court looks to North Carolina law for guidance.[6]  Under North

_____

    6  Plaintiff made a passing reference to North Carolina law (<u>see</u> Docket Entry 17 at 3), but the parties engaged in no choice-of-law analysis (<u>see</u> Docket Entries 16, 17, 22).  Under similar circumstances, another court in this Circuit held that, "[i]n a federal question case that incorporates a state law issue, such as contract formation, a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise."  <u>Baker v. Antwerpen Motorcars, Ltd.</u>, 807 F. Supp. 386, 388–89 & n.13 (D. Md. 2011) (noting Maryland's

Carolina law, "[a] valid contract requires [1] offer, [2] acceptance, [3] consideration and [4] no defenses to formation." Koltis v. North Carolina Dep't of Human Res., 125 N.C. App. 268, 271, 480 S.E.2d 702, 704 (1997) (citing Copy Prods., Inc. v. Randolph, 62 N.C. App. 553, 555, 303 S.E.2d 87, 88 (1983)).

"To state a claim to compel arbitration under the FAA, [a litigant] must allege (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute." Whiteside, 940 F.2d at 102. If the party seeking to compel arbitration establishes the existence of "an arbitration provision that purports to cover the dispute," Dillon, 173 F. Supp. 3d at 263, the party opposing arbitration "must make an unequivocal denial that an arbitration agreement exists — and must also show sufficient facts in support," Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015). "This

_____

lex loci contractus rule and applying Maryland law to contract formation issue). The Court notes that, with respect to questions of contract validity, North Carolina likewise applies the law of the place "where the contract is made," Fast v. Gulley, 271 N.C. 208, 211, 155 S.E.2d 507, 509–10 (1967). Because the parties signed the Agreement in North Carolina, the Court views North Carolina law as instructive here.

7

burden on the opponent only arises, however, after the proponent produces credible, admissible evidence which satisfies the Court that there was an arbitration agreement." Dillon, 173 F. Supp. 3d at 264. "This standard is akin to the burden on summary judgment." Chorley Enters., Inc., 807 F.3d at 564; accord Erichsen v. RBC Capital Mkts., LLC, 883 F. Supp. 2d 562, 566 (E.D.N.C. 2012).

"The party seeking to compel arbitration must prove the existence of a mutual agreement to arbitrate." Thompson v. Norfolk & Southern Ry., 140 N.C. App. 115, 120, 535 S.E.2d 397, 400 (2000) (emphasis added). However, "a non[-]signatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the non[-]signatory despite the fact that the signatory and non[-]signatory lack an agreement to arbitrate." American Bankers Ins. Grp. v. Long, 453 F.3d 623, 627 (4th Cir. 2006); see also International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416–17 (4th Cir. 2000) ("Well-established common law principles dictate that in an appropriate case a non[-]signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."). For example, a non-signatory parent company may enforce an arbitration agreement "when allegations against '[the] parent company and its subsidiary are based on the same facts and are inherently inseparable.'" International Paper Co., 206 F.3d at

417 (quoting <u>J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.</u>, 863 F.2d 315, 320-21 (4th Cir. 1988)).

Additionally, a business entity (like PRS) may conduct business in North Carolina under an assumed name. <u>See generally</u> <u>Tyson v. L'Eggs Prods., Inc.</u>, 84 N.C. App. 1, 7, 351 S.E.2d 834, 838 (1987) ("It seems to be universally recognized that a corporation may do business under an assumed name, or a name differing from its true corporate name.").[7] Before doing so, however, the business entity "must file an assumed business name certificate in the office of the register of deeds of the [North Carolina] county in which the [business entity] is or will be engaged in business." N.C. Gen. Stat. § 66-71.4(a). The certificate must identify the assumed business name and include "[a] real name of the person engaging in business under the assumed business name[, . . . t]he nature of the business[, . . . t]he street address of the principal place of business[, and e]ach county where the person uses or will be using the assumed business name." N.C. Gen. Stat. § 66-71.5(a).

The filing (or lack) of such certificate may vindicate (or frustrate) attempts to enforce contractual obligations. For example, in <u>AMOCO v. AAN Real Estate, LLC</u>, 232 N.C. App. 524, 754

---

7  For a limited liability company, an assumed name means "any name other than the name stated in its articles of organization filed with the Secretary of State." N.C. Gen. Stat. § 66-71.3(1)(e).

9

S.E.2d 844 (2014), American Oil Co., Inc. sued a real estate company alleging several breaches of a lease. Id. at 524-25, 754 S.E.2d at 845. However, the lease agreement identified the lessee as "American Oil Group," not American Oil Co., Inc. Id. American Oil Co., Inc. failed to allege facts to "link the two" and never complied with the (then-operative) North Carolina statute "requir[ing] that a business operating under an assumed name file a certificate." Id. at 526-27, 754 S.E.2d at 846.[8] For these reasons, American Oil Co., Inc. lacked standing, and its complaint faced dismissal as a result. Id., 754 S.E.2d at 846-47.

A similar issue arose in Cyber Imaging Sys., Inc. v. Eyelation, Inc., No. 5:14-CV-901, 2015 WL 2152872 (E.D.N.C. May 7, 2015) (unpublished). Cyber Imaging Systems, Inc. sued to enforce an arbitration award, and Eyelation, Inc. moved to dismiss for lack of standing. Id. at *1-2. The dismissal effort hinged on the fact that "Cyber Imaging, Inc.[, not Cyber Imaging Systems, Inc.,] was the named party to the [underlying] contract and arbitration." Id. at *2 (emphasis added). However, "a Corporate Certificate of Assumed Name . . . demonstrate[d] that Cyber Imaging Systems, Inc.[] does business as CyberImaging, Inc." Id. Despite the misnomer in the contract and during arbitration, Cyber Imaging

_____

    8    The Assumed Business Name Act, N.C. Gen. Stat. §§ 66-71.1 — 66-71.15, discussed above, has replaced N.C. Gen. Stat. § 66—68 (the statute cited in AMOCO).

10

Systems, Inc. remained the proper party to enforce the arbitration award. Id.

Consistent with that conclusion, the term "d/b/a" preceding a business name "signals that the business may be licensed or incorporated under a different name." D/b/a, Black's Law Dictionary (11th ed. 2019). The United States Court of Appeals for the Fourth Circuit has observed that "[u]sing d/b/a or 'doing business as' to associate an assumed or fictitious name with a corporation does not, without more, create a separate legal entity different from the corporation." Snowden v. Checkpoint Check Cashing, 290 F.3d 631, 634 n.2 (4th Cir. 2002) (quoting 8 Fletcher Cyclopedia of the Law of Private Corporations § 3831 (revised ed. 1992 & Supp. 1999)). North Carolina courts likewise have held that a business entity and its assumed name do not constitute two separate legal entities. See Liss v. Seamark Foods, 147 N.C. App. 281, 286, 555 S.E.2d 365, 369 (2001).

## B. Analysis

James and PRS disagree on two points: whether PRS stands as a party to the Agreement, and whether the geographical impossibility of an arbitration in Charlotte yet within 25 miles of Morrisville precludes enforcement of the Agreement.

With respect to the first question, PRS has failed to show that an arbitration agreement exists between James and PRS. As James has pointed out, the Agreement identifies "Cap Cab" as the

11

entity with whom James agreed to arbitrate. In reply, PRS maintained that "[PRS] does business as Capital Cabaret" and that "'Cap Cab' is an abbreviation of Capital Cabaret." (Docket Entry 22 at 3 (emphasis omitted).)[9] Such "[a]rgument of counsel is not evidence." <u>Morrissey v. William Morrow & Co.</u>, 739 F.2d 962, 967 (4th Cir. 1984). Apart from the Agreement, the Arbitration Motion contains "no citation to materials in the record," <u>Penn v. Citizens Telecom Servs. Co.</u>, 999 F. Supp. 2d 888, 896 (S.D.W. Va. 2014). On its face, the Agreement exists only between James and "Cap Cab." (<u>See</u> Docket Entry 16-1 at 1-4.)

Nonetheless, the Court "may properly take judicial notice of matters of public record." <u>Philips v. Pitt Cty. Mem. Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009). Here, public records inform the Court's view of the relationship, if any, between PRS and "Cap Cab." Specifically, the Court looks to the Wake County Register of Deeds, as Wake County encompasses Morrisville (home to the site where James worked). According to a Certificate of Assumed Name for a Limited Liability Company, RPS Holdings, LLC does business under the assumed name Capital Cabaret. *Consolidated Real Property Index*, Wake County Register of Deeds, http://services.wakegov.com/AssumedNames/PDFView.aspx?DocID=108418257&RecordDate=02/04/2010

---

9    PRS's reply observes that the caption of the Complaint suggests that PRS does business as Capital Cabaret. (Docket Entry 22 at 3.) However, "[a]llegations contained in a complaint are not evidence." <u>Cambridge Capital Grp., Inc. v. Pill</u>, 20 F. App'x 121, 124-25 (4th Cir. 2001).

(last visited Jan. 29, 2021).  No other entity appears to have filed a certificate to do business in Wake County under that name, and the certificate clarifies that Capital Cabaret exists only as the assumed name of RPS Holdings, LLC, not as a separate legal entity, consistent with pertinent authority, see Snowden, 290 F.3d at 634 n.2; Liss, 147 N.C. App. at 286, 555 S.E.2d at 369. Accordingly, to the extent "Cap Cab" represents an abbreviation for "Capital Cabaret," when James signed the Agreement with "Cap Cab," she may have contracted with RPS Holdings, LLC, but she would not appear to have thereby established any relationship with PRS.

Further, if PRS does business as Capital Cabaret, PRS neglected to file a certificate, as required by North Carolina law, to document its use of that assumed name, see AMOCO, 232 N.C. App. at 526-27, 754 S.E.2d at 846-47.  The certificate filed by RPS Holdings, LLC also undercuts PRS's position.  Finally, because PRS resisted characterization as a non-signatory (see Docket Entry 22 at 1-3), it never argued for an exception to the general rule prohibiting non-signatories from enforcing contracts, see International Paper Co., 206 F.3d at 416-17.  In other words, PRS has not asserted that the Complaint involves "inherently inseparable" claims against RPS Holdings, LLC and PRS or that the circumstances otherwise warrant enforcement of the Agreement by a non-signatory, id.

In all, record evidence fails to establish a link between PRS and RPS Holdings, LLC or between PRS and the assumed name Capital Cabaret (or "Cap Cab"). Accordingly, PRS has not carried its burden to show an arbitration agreement between the parties.[10]

## CONCLUSION

PRS has not demonstrated that James agreed to arbitrate her claims against PRS.

**IT IS THEREFORE ORDERED** that the Arbitration Motion (Docket Entry 16) **IS DENIED WITHOUT PREJUDICE.**

This 29th day of January, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

---

10   In light of the above determination, the Court declines to consider the proper locale for any arbitration under the Agreement. The Court notes, however, that geography may present a distinct challenge in this case. "[A] district court deciding a motion to compel arbitration [under the FAA] shall defer to the terms of the parties' agreement." Elox Corp. v. Colt Indus., No. 90-2456, 952 F.2d 395 (table), 1991 WL 263127, at *1 (4th Cir. Dec. 16, 1991) (unpublished). Here, no possibility of enforcement of the Agreement on its terms may exist, as no location in Charlotte lies within 25 miles of Morrisville. PRS has suggested that the parties may agree to arbitrate elsewhere in North Carolina, but that suggestion involves either a separate agreement (which would require James's assent) or a potential interpretation of the Agreement that ignores the terms relating to Charlotte. If arbitration in Charlotte constitutes the proper course, this Court lacks authority to compel arbitration. See id. ("[I]f a court orders arbitration, the arbitration must be held in the same district as the court."); see also 28 U.S.C. § 113(c) (identifying Charlotte as part of Western District of North Carolina).