## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SIOBHAN JAMES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:20CV134 |
| | ) | |
| RPS HOLDINGS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on (1) "Plaintiff's Amended Motion to Conditionally Certify This Matter as a Collective Action and for a Court-Authorized Notice to be Issued Under Section 216(b) of the Fair Labor Standards Act" (Docket Entry 35 (the "New Certification Motion")) and (2) Defendant's "Motion to Compel Arbitration and Motion to Dismiss or, in the Alternative, to Stay Proceedings" (Docket Entry 41 (the "New Arbitration Motion")). (See Docket Entry 27 (referring case to undersigned United States Magistrate Judge for disposition on consent of parties, pursuant to 28 U.S.C. § 636(c)).) For the reasons that follow, the Court will (i) deny the New Arbitration Motion and (ii) grant in part and deny in part the New Certification Motion.

## BACKGROUND

Siobhan James (the "Plaintiff") initiated this action against PRS Partners, LLC, d/b/a Capital Cabaret ("PRS"), alleging that PRS violated the Fair Labor Standards Act ("FLSA") and the North

Carolina Wage and Hour Act ("NCWHA"). (Docket Entry 1 (the "Original Complaint"), ¶¶ 1-2.) Plaintiff lodged such claims on behalf of herself and similarly situated individuals (see id.) and further asserted, in an individual capacity, several common-law claims against PRS (id., ¶ 6).

As the Court (per the undersigned) previously explained:

> According to the [Original] Complaint, from approximately July 2016 until January 2018, [Plaintiff] worked for PRS at "Capital Cabaret Gentlemen's Club in Morrisville, North Carolina." PRS allegedly misclassified [Plaintiff] as an independent contractor (rather than an employee) and failed to pay proper wages for hours worked. This alleged conduct forms the basis of the FLSA and NCWHA claims. As concerns the common-law claims, the [Original] Complaint alleges that Tim Koller, a manager at the site where [Plaintiff] worked, attacked [her] during one of her shifts. Based on this incident, the [Original] Complaint charges PRS with negligent employment, supervision, and retention; assault; battery; intentional infliction of emotional distress; negligent infliction of emotional distress; and wrongful discharge.

James v. PRS Partners, LLC, 1:20CV134, 2021 WL 309115, at *1 (M.D.N.C. Jan. 29, 2021) (unpublished) (internal citations omitted). Shortly thereafter, Plaintiff moved for, inter alia, "conditional certification of this action and for court-authorized notice pursuant to [Section] 216(b) of the [FLSA]" (Docket Entry 8 (the "Old Certification Motion") at 1).

Instead of answering the Original Complaint, PRS sought an order compelling arbitration, contending that Plaintiff and PRS had signed an arbitration agreement (the "Agreement") covering all of Plaintiff's claims. (See Docket Entry 16 (the "Old Arbitration

2

Motion"), ¶¶ 3-4; <u>see also</u> Docket Entry 16-1 at 2-4 (copy of Agreement).)  The signatories to the Agreement, identified as "S. James" and "Cap Cab" (<u>see</u> Docket Entry 16-1 at 2, 4), agreed to arbitrate "covered claims . . . on an individual basis" (<u>id.</u> at 2). The Agreement defines "covered claims" to include

> all claims alleging discrimination, harassment, retaliation and/or related to [Plaintiff's] compensation by [Cap Cab] for the services [she] performs, and specifically including any claim or cause of action alleging [Plaintiff] is an employee of [Cap Cab] and/or was improperly or insufficiently paid wages under the [FLSA] or any state or local wage and hour law, regardless of whether the covered claims arose or accrued prior or subsequent to [Plaintiff] entering into th[e] Agreement.

(<u>Id.</u>)  The Agreement purports to bind the "owners, directors, officers, managers, employees, [and] agents" (<u>id.</u>) of "Cap Cab." The signatories further promised not to "lead, join, or serve as a member of a class or group of persons [or entities] bringing such 'covered claims'" (<u>id.</u>) and agreed to bring any such (individual) claims in a single arbitration proceeding (<u>id.</u>).  The Agreement provides that arbitration would occur "at a location in Charlotte, North Carolina[,] within twenty-five (25) miles of the last place [Plaintiff] provided services to [Cap Cab], unless the parties agree otherwise."  (<u>Id.</u> at 3.)

Plaintiff opposed the Old Arbitration Motion, insisting that PRS, as a non-signatory to the Agreement, lacked the ability to enforce it.  (<u>See</u> Docket Entry 17 at 5-9.)  She also challenged the Agreement based on its geographical restriction, noting that more

3

than 150 miles separate Charlotte and Morrisville (home to Capital Cabaret). (See id. at 5.)

The Court (per the undersigned) denied the Old Arbitration Motion without prejudice, observing that the Agreement appeared to exist between Plaintiff and a putative entity "Cap Cab." See James, 2021 WL 309115, at *1–2 (summarizing contents of Agreement and describing signatures as "S. James" and indecipherable initials). Even if "Cap Cab" constituted an abbreviation for some entity's assumed name of Capital Cabaret, the Court (A) explained that an assumed name lacks status as a legal entity and (B) took judicial notice of the fact that another entity, RPS Holdings, LLC ("RPS"), had documented its use of the assumed name "Capital Cabaret" via a Certificate of Assumed Name for a Limited Liability Company. See id. at *5. In contrast, PRS had filed no such certificate. See id. Because the "record evidence . . . establish[ed no] link between PRS and RPS [] or between PRS and the assumed name Capital Cabaret (or 'Cap Cab') . . . PRS ha[d] not carried its burden to show an arbitration agreement between the parties." Id. at *6.[1]

_____

    1 Given that resolution, "the Court decline[d] to consider the proper locale for any arbitration under the Agreement." Id. at *6 n.10. However, the Court noted the impossibility of enforcing the Agreement's geographical restriction, "as no location in Charlotte lies within 25 miles of Morrisville." Id. The Court also acknowledged its lack of authority to compel arbitration in Charlotte or anywhere else outside this District. Id. (citing Elox Corp. v. Colt Indus., Inc., No. 90-2456, 952 F.2d 395 (table), 1991 WL 263127, at *1 (4th Cir. Dec. 16, 1991) (unpublished)).

4

PRS opposed the Old Certification Motion and clarified, in light of the foregoing ruling, that RPS (not PRS) constituted the proper defendant in this action. (Docket Entry 29, ¶¶ 25-26 (stating that RPS "owns and operates Capital Cabaret" and that "[PRS] is merely the landlord, and has no ownership or control, whatsoever, over Capital Cabaret").) After representing that RPS possessed "a valid and enforceable [a]rbitration [a]greement with [] Plaintiff" (id., ¶ 28), PRS offered to stipulate to a substitution of defendants in exchange for Plaintiff's submission to arbitration in a location other than Charlotte (see id., ¶¶ 29-31). The following day, PRS filed a declaration from Phong Nguyen, who averred as to his status as a principal in both PRS and RPS. (Docket Entry 30 (the "Nguyen Declaration"), ¶ 4.)

Per the Nguyen Declaration: PRS owns the building that houses (and serves as the landlord for) Capital Cabaret. (Id., ¶¶ 6-7.) However, PRS lacks an ownership interest in Capital Cabaret and plays no role in its operation. (Id., ¶ 8.) In contrast, "RPS [] owns and operates . . . Capital Cabaret" (id., ¶ 5) and "entered into an [a]rbitration [a]greement with [] Plaintiff" (id., ¶ 9).

Plaintiff replied in support of the Old Certification Motion, declining the offer to arbitrate outside of Charlotte (see Docket Entry 31 at 3 n.2) and suggesting that "the Court has already identified [the A]greement as unenforceable" (id. at 3). As

5

concerns Plaintiff's failure to identify and serve the proper defendant, she characterized such error as a "misnomer" (id. at 4).

Upon review of those filings, the Court denied the Old Certification Motion without prejudice and imposed a deadline for Plaintiff to move to amend the Original Complaint. (See Text Order dated Mar. 1, 2021.) More specifically, the Court noted that the "[Original] Complaint demands relief from the landlord of the proper defendant [instead of] the proper defendant" (id.), which amounts to misidentification, not misnomer (see id. (explaining that Plaintiff had sued wrong entity, rather than misnamed correct entity)). That circumstance prevented the Court from conditionally certifying this case as a collective action. (See id.) Moreover, because PRS and RPS had not agreed to substitute the proper entity as defendant, Plaintiff bore the obligation "to seek leave to amend [the Original] Complaint" (id.).

Shortly thereafter, Plaintiff, with counsel for PRS's written consent,[2] moved to amend the Original Complaint. (See Docket Entry 32; see also Docket Entries 32-2 (written consent), 32-3 (proposed amended complaint).) The Court granted that unopposed motion, directing Plaintiff to file the proposed amended complaint and to "promptly accomplish service of process on [RPS]" (Text Order dated

_____

2  Counsel for PRS also represents RPS. (See Docket Entry 37.) The written consent does not clarify on which entity's behalf counsel consented to the filing of an amended complaint. (See Docket Entry 32-2.)

6

Mar. 4, 2021), and Plaintiff complied (see Docket Entries 33 (the "Operative Complaint"), 34 (summons)). The Operative Complaint names RPS in place of PRS but otherwise generally mirrors the Original Complaint (with the exception of typographical errors or other minor changes not relevant here). (See Docket Entry 32-3 at 3-34 (redlined version of Operative Complaint).)

Plaintiff has renewed her motion to conditionally certify this matter as a collective action. (See Docket Entry 35; see also Docket Entry 36 (supporting memorandum).) In particular, Plaintiff has sought

> (1) conditional certification of this action and for court-authorized notice pursuant to [Section] 216(b) of the [FLSA]; (2) approval of the proposed notice of this action and the consent and opt-out [sic] forms; (3) a production of names, last known mailing addresses, last[]known cell phone numbers, email addresses, and dates of employment of all putative plaintiffs within fifteen (15) days of the Order; (4) ability to distribute the Notice and Opt-in Form via first[-]class mail and email to all putative plaintiffs of the conditionally certified collective, with a reminder mailing to be sent 45[]days after the initial mailing to all non-responding putative plaintiffs; and (5) requiring [RPS] to post the Notice and Consent Form in a conspicuous location within the dressing room at . . . Capital Cabaret for the full 90-day Notice period.

(Docket Entry 35 at 1-2.) Plaintiff has defined the proposed collective ("Putative Plaintiffs") as "[a]ll individuals who were, are, or will be employed at . . . Capital Cabaret gentleman's club as exotic dancers and who were classified as independent contractors at any time three years prior to the commencement of this action, through the present." (Docket Entry 36 at 6.)

7

Together with the New Certification Motion, Plaintiff tendered the above-referenced proposed notice (Docket Entry 36-2 ("Notice")), proposed reminder notice (Docket Entry 36-3 ("Reminder Notice")), and proposed consent form (Docket Entry 36-4 at 2-3 ("Consent Form")), as well as a form for collecting the information that Plaintiff has requested from RPS (Docket Entry 36-4 at 4 ("Client Information Sheet")).[3]  The Notice describes this action (see Docket Entry 36-2 at 2-3) and characterizes Putative Plaintiffs as "all current and former exotic dancers who worked for Capital Cabaret at any time between February 2017[] to the present, who were classified as independent contractors and not paid wages for hours worked" (id. at 3).  The Notice sets a 90-day deadline for Putative Plaintiffs to opt in to this action (see id.), details the consequences of that decision (see id. at 3-4), and advises Putative Plaintiffs that the statute of limitations (elsewhere identified as three years, id. at 4) allows recovery for "improperly denied compensation only for time worked within the two

---

3  Although Plaintiff at times has described it as requesting the "names, last known mailing addresses, last[]known cell phone numbers, email addresses, and dates of employment of all [P]utative [P]laintiffs" (Docket Entry 35 at 1), the Client Information Sheet also includes a space to indicate Putative Plaintiffs' home telephone numbers and job titles (see Docket Entry 36-4 at 4).  Plaintiff's memorandum in support of the New Certification Motion mentions the request for home telephone numbers but not job titles.  (See Docket Entry 36 at 20.)  The proposed order accompanying the New Certification Motion likewise directs RPS to produce Putative Plaintiffs' home telephone numbers but omits job titles.  (See Docket Entry 35-1 at 1.)

8

or three years prior to the date [they] file [their] consent form" (<u>id.</u>).

Plaintiff also submitted a declaration (Docket Entry 36-1 ("Plaintiff's Declaration")), which describes, inter alia, RPS's control over her working conditions and those of Putative Plaintiffs. (<u>See</u> <u>id.</u>, ¶¶ 2-30.)

According to Plaintiff's Declaration:

"[RPS] set and determined the method of pay, schedules, work attire, and minimum hours worked per shift for all exotic dancers working [at Capital Cabaret]." (<u>Id.</u>, ¶ 21.) RPS possessed "the ability to discipline, fine, and fire all other exotic dancers[] and would supervise their work to make sure each dancers' job performance met [RPS]'s standards." (<u>Id.</u>)

RPS also collected from Plaintiff and all other exotic dancers various "fees and penalties . . ., including 'house fees,' 'tip-outs,' and 'early release fees.'" (<u>Id.</u>, ¶ 28.) In particular, "[RPS] required [Plaintiff] to pay a 'House Fee,' which totaled at least $35 per shift, but would increase $15 per hour that [she] was late for [her] shift." (<u>Id.</u>, ¶ 15.) RPS assessed "an 'Early Release Fee' of between $75.00-$125.00 if [Plaintiff] needed to leave [her] shift early." (<u>Id.</u>, ¶ 16.) Plaintiff understood that "[her] employment with [RPS]" also required her "to 'tip-out' several of [RPS]'s other employees at the end of each [of

9

her] shifts, including managers, bartenders, DJs, House Moms, valets, showgirls and bouncers." (<u>Id.</u>, ¶ 17.)

As far as RPS's policies, RPS did not "post or otherwise make visible or available at Capital Cabaret any information either in writing or orally regarding any payment of wages, or information that notified employees, including exotic dancers, working at Capital Cabaret of the federal overtime pay requirement or of the federal "tip credit" requirement." (<u>Id.</u>, ¶ 23.) Plaintiff averred that "[RPS] required . . . each exotic dancer [to] sign a document stating that they [we]re independent contractors, that they [we]re not entitled to wages, and that the only money the exotic dancers were entitled to receive from their work as an exotic dancer was from tips received from customers." (<u>Id.</u>, ¶ 24.) Plaintiff signed such document but never received a copy of the same. (<u>Id.</u>, ¶ 25.)

Consistent with that policy, RPS never paid wages to Plaintiff or Putative Plaintiffs but "sometimes set or promoted specials or deals for customers" (<u>id.</u>, ¶ 26), which "all dancers were required to perform" (<u>id.</u>). "No dancer's pay was tied to the income or profit that [RPS] received" (<u>id.</u>), and "no exotic dancer ever made a financial investment in [RPS] or any equipment belonging to [RPS]" (<u>id.</u>, ¶ 27). Based on her "personal knowledge [of] at least three-hundred (300) exotic dancers [that] have been employed by [RPS] at . . . Capital Cabaret . . . in the past three (3) years" (<u>id.</u>, ¶ 29), Plaintiff averred "that none . . . w[as] paid by [RPS]

10

at an hourly rate at least equal to the federal minimum wage" (id.).

RPS opposed the New Certification Motion (see Docket Entry 39) and, echoing the position previously taken by PRS, sought an order compelling arbitration and dismissing this action or, in the alternative, staying judicial proceedings (see Docket Entry 41; see also Docket Entry 41-1 at 2-4 (copy of Agreement)).[4] Plaintiff opposed the New Arbitration Motion (see Docket Entry 42), and RPS replied (see Docket Entry 44). Plaintiff replied in support of the New Certification Motion (see Docket Entry 43) and filed a "suggestion of subsequently decided authority" (Docket Entry 46 (all-caps font and emphasis omitted)).

## DISCUSSION

### I. New Arbitration Motion

### A. Legal Standards

#### 1. Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, renders enforceable written arbitration contracts, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[T]he FAA represents 'a liberal federal policy favoring arbitration agreements.'" O'Neil v. Hilton Head Hosp., 115 F.3d 272, 273 (4th Cir. 1997) (quoting Moses H. Cone Mem'l

_____

4   The Agreement tendered by RPS mirrors the Agreement that had accompanied PRS's Old Arbitration Motion. (Compare Docket Entry 41-1 at 2-4, with Docket Entry 16-1 at 2-4.)

11

Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). "Generally, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999) (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25). However, "[t]he presumption . . . applies only when 'a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand,' not when there remains a question as to whether an agreement even exists between the parties in the first place." Raymond James Fin. Servs. v. Cary, 709 F.3d 382, 386 (4th Cir. 2013) (quoting Granite Rock Co. v. International Bhd. of Teamsters, 561 U.S. 287, 301 (2010)). In other words, neither the FAA nor its accompanying presumption favoring arbitration implies that courts should "grant blindly all motions to compel arbitration." Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC, 993 F.3d 253, 257 (4th Cir. 2021).

Importantly, "[t]here is a difference between disputes over arbitrability and disputes over contract formation." Id. at 258. When parties disagree about the latter issue (i.e., whether they formed an agreement to arbitrate at all), "the dispute is generally for courts to decide." Granite Rock, 561 U.S. at 296; see also Rowland, 993 F.3d at 257 ("The FAA balances the goals of facilitating arbitration with the aims of contract law by recognizing a limited role for federal courts to play."). Courts

12

thus carry out "an important [pre-arbitration] function," Rowland, 993 F.3d at 258, in "decid[ing] the threshold issue of contract formation. . . [and] permitt[ing arbitration] only when the parties [have] agree[d] to it," id. The foregoing framework, as contemplated by the FAA, "respects party autonomy and the general principles of contract law." Id.

"The [FAA] provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, [9 U.S.C.] § 4." Moses H. Cone Mem'l Hosp., 460 U.S. at 22; see also Patten Grading & Paving, Inc. v. Skanska U.S. Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004) ("To further facilitate arbitration, the FAA authorizes a party to an arbitration agreement to demand a stay of proceedings in order to pursue arbitration, 'provided the applicant for the stay is not in default' of that right." (quoting 9 U.S.C. § 3)).

Turning first to Section 4, a party seeking to compel arbitration must establish:

> (1) the existence of a dispute between the parties, (2) a
> written agreement that includes an arbitration provision
> which purports to cover the dispute, (3) the relationship
> of the transaction, which is evidenced by the agreement,
> to interstate or foreign commerce, and (4) the failure,
> neglect or refusal of [the other party] to arbitrate the
> dispute.

American Gen. Life & Accident Ins. Co. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005) (internal quotation marks omitted). If the party

requesting arbitration establishes these four factors, "the party opposing arbitration must come forward with sufficient facts to place the entitlement to arbitration in dispute." Scales v. SSC Winston-Salem Operating, Co., No. 1:17CV539, 2017 WL 4467278, at *2 (M.D.N.C. Oct. 5, 2017) (unpublished) (citing Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015), and Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995)). "This standard is akin to the burden on summary judgment." Chorley Enters., 807 F.3d at 564; accord Rowland, 993 F.3d at 258 ("In applying th[e summary judgment] standard, the burden is on the [party seeking arbitration] to 'establish[] the existence of a binding contract to arbitrate the dispute.'" (third set of brackets in original) (quoting Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., 867 F.3d 449, 456 (4th Cir. 2017))). "Accordingly, the [C]ourt may consider materials outside the pleadings" in resolving a motion to compel arbitration. CIP Constr. Co. v. Western Sur. Co., No. 1:18CV58, 2018 WL 3520832, at *4 (M.D.N.C. July 20, 2018) (unpublished). When the Court determines that arbitration should occur, the Court must "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4 (emphasis added); see also id. ("The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.").

14

In contrast, "a Section 3 [stay] does not concern itself with the place of arbitration. Rather the court merely enters an order staying [judicial] proceedings until such arbitration proceedings are completed." Forshaw Indus. v. Insurco, Ltd., 2 F. Supp. 3d 772, 788-89 (W.D.N.C. 2014). Moreover, the Court must stay judicial proceedings upon concluding that "that the issue involved in such suit or proceeding is referable to arbitration under [a written arbitration] agreement." 9 U.S.C. § 3; see also Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) ("This stay-of-litigation provision is mandatory."). Even

> where a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district, the court may still determine that the dispute nonetheless remains "referable to arbitration" elsewhere, if a forum is designated, and must then order a stay pursuant to [Section] 3 instead, thereby leaving the parties free to pursue their contractual rights and remedies in the appropriate venue.

Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc., 269 F. Supp. 2d 356, 363 (S.D.N.Y. 2003) (brackets omitted) (quoting 9 U.S.C. § 3 and DaPuzzo v. Globalvest Mgmt. Co., L.P., 263 F. Supp. 2d 714, 739 (S.D.N.Y. 2003)); see also, e.g., American Heart Disease Prevention Found. v. Hughey, No. 96-1199, 106 F.3d 389 (table), 1997 WL 42714, at *5 (4th Cir. Feb. 4, 1997) (unpublished) (noting that federal court in Virginia, "[a]s a proper and convenient forum," could grant Section 3 stay despite agreement to arbitrate in New Jersey); Southern Concrete Prods., Inc. v. ARCO Design/Build, Inc., No. 1:11CV194, 2012 WL 1067906, at *8 (W.D.N.C. Mar. 29, 2012)

15

(unpublished) (issuing Section 3 stay of declaratory-judgment action brought by party seeking to avoid arbitration in St. Louis, Missouri).

### 2. Relevant Contract and Agency Principles

Before deciding whether the Agreement entitles RPS to an order compelling arbitration or a stay of judicial proceedings, the Court must determine the source of governing law. See Rowland, 993 F.3d at 257 ("Whether an agreement to arbitrate was formed is a question of 'ordinary state-law principles that govern the formation of contracts.'" (quoting Hill v. PeopleSoft USA, Inc., 412 F.3d 540, 543 (4th Cir. 2005))). As with the Old Arbitration Motion, see James, 2021 WL 309115, at *3 n.6, the parties have declined to engage in a choice-of-law analysis (see Docket Entry 41 at 1–7 (lacking any discussion on that subject); Docket Entry 42 at 10–12 (alternately citing, without elaboration, federal and North Carolina law)). In resolving the Old Arbitration Motion, the Court previously explained that, "[i]n a federal question case that incorporates a state law issue, such as contract formation, a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." James, 2021 WL 309115, at *3 n.6 (quoting Baker v. Antwerpen Motorcars, Ltd., 807 F. Supp. 2d 386, 388–89 & n.13 (D. Md. 2011) (noting Maryland's lex loci contractus rule and applying Maryland law to contract formation issue)). Because "North

16

Carolina likewise applies the law of the place 'where the contract is made,'" id. (quoting Fast v. Gulley, 271 N.C. 208, 211, 155 S.E.2d 507, 509-10 (1967)), and Plaintiff (presumably) "signed the Agreement in North Carolina, the Court [continues to] view[] North Carolina law as instructive," id.

Accordingly, the Court will consider North Carolina law "[t]o determine whether the parties agreed to arbitrate [this] dispute," CIP Constr., 2018 WL 3520832, at *5. Turning to the substance of that governing law, "[f]or a valid contract to be formed, the two parties must 'assent to the same thing in the same sense, and their minds meet as to all terms.'" Rowland, 993 F.3d at 258-59 (quoting Normile v. Miller, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985)). Moreover,

> [i]n determining if an agreement to arbitrate exists, North Carolina law instructs "the [C]ourt to examine the language of the contract itself for indications of the parties' intent . . . ." State v. Philip Morris, USA, Inc., 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). The parties' intent is determined in light of the "contract as a whole." Id. The [C]ourt must give the contract's language its ordinary meaning and presume that the parties intended the plain meaning of the words, absent evidence to the contrary. Anderson v. Anderson, 145 N.C. App. 453, 458, 550 S.E.2d 266, 269-70 (2001) (citations omitted).

CIP Constr., 2018 WL 3520832, at *5 (ellipsis in original). When confronted with ambiguity in a contract, North Carolina courts construe the contract "against the drafter, which had the best opportunity to protect its interests." Silvers v. Horace Mann Ins. Co., 324 N.C. 289, 295, 378 S.E.2d 21, 25 (1989).

In interpreting contracts, "[c]ourts are not licensed to ignore the old chestnuts — cases that remind us that (1) certain formalities are required for a contract to be formed, and (2) when the formalities are met, a contract it does make." Rowland, 993 F.3d at 260 (internal citations omitted). Such formalities require that contracting parties manifest agreement on "two sets of external signs — not on the parties' having *meant* the same thing but on their having *said* the same thing." Id. (emphasis in original) (quoting Oliver Wendell Holmes, The Path of the Law, 110 Harv. L. Rev. 991, 996 (1997) (reprint of address given at Boston University School of Law on January 8, 1897)). When parties fail to "turn square corners," id., "slopp[iness]" may defeat contract formation, see id.

"The party seeking to compel arbitration must prove the existence of a mutual agreement to arbitrate." Thompson v. Norfolk & S. Ry., 140 N.C. App. 115, 120, 535 S.E.2d 397, 400 (2000) (emphasis added). However, "a non[-]signatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the non[-]signatory despite the fact that the signatory and non[-]signatory lack an agreement to arbitrate." American Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006); see also International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416–17 (4th Cir. 2000) (identifying "1) incorporation by references;

18

2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel" as potential common-law theories allowing for enforcement by non-signatory); Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd., 209 N.C. App. 564, 575, 706 S.E.2d 262, 269 (2011) (mentioning third-party beneficiary as theory for enforcement of contract by non-signatory). For example, this Court (per United States District Judge Loretta C. Biggs) allowed a non-signatory affiliate of a signatory to enforce an arbitration agreement when the contract included within its scope such affiliates and evinced an intent to include the affiliate as a third-party beneficiary. See Barber v. Charlotte Motor Speedway, LLC, No. 1:13CV99, 2014 WL 6686730, at *3-4 (M.D.N.C. Nov. 26, 2014) (unpublished), recommendation adopted, slip op. (M.D.N.C. Feb. 11, 2015); see also Broyles v. KFC of Am., Inc., Civ. Action No. 2:05-0605, 2006 WL 8438421, at *4 (S.D.W. Va. May 3, 2006) (unpublished) (allowing franchisor, as related company of signatory franchisee, to enforce arbitration agreement).

Because artificial entities (such as limited liability companies) can act only through their agents, see Zimmerman v. Hogg & Allen, Pro. Ass'n, 286 N.C. 24, 30, 209 S.E.2d 795, 799 (1974), agency law may inform how such entities enter and enforce contracts (to include arbitration agreements). "An agent may contractually bind a principal to a third party if the third party can establish an agency relationship between the principal and agent." Short v.

19

<u>Circus Trix Holdings, LLC</u>, 274 N.C. App. 311, 318, 852 S.E.2d 388, 393 (2020). In that regard,

> [a] principal is liable upon a contract duly made by its agent with a third person in three instances: when the agent acts within the scope of his or her actual authority; when a contract, although unauthorized, has been ratified; or when the agent acts within the scope of his or her apparent authority, unless the third person has notice that the agent is exceeding actual authority.

<u>Foote & Davies, Inc. v. Arnold Craven, Inc.</u>, 72 N.C. App. 591, 595, 324 S.E.2d 889, 892 (1985). As a general rule, "if [an] agent . . . lacks authority to bind his principal . . . to a contract with a third party . . . yet purports to do so anyway, no contract is formed between the principal and the third party." <u>Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.</u>, 944 F.3d 225, 238 (4th Cir. 2019) (interpreting contract governed by South Carolina law).

As explained in connection with the Old Arbitration Motion, "the term 'd/b/a' preceding a business name 'signals that the business may be licensed or incorporated under a different name.'" <u>James</u>, 2021 WL 309115, at *5 (quoting <u>d/b/a</u>, <u>Black's Law Dictionary</u> (11th ed. 2019)). "Using d/b/a or 'doing business as' to associate an assumed or fictitious name with a corporation does not, without more, create a separate legal entity different from the corporation." <u>Snowden v. Checkpoint Check Cashing</u>, 290 F.3d 631, 634 n.2 (4th Cir. 2002) (quoting 8 Fletcher Cyclopedia of the Law of Corporations § 3831 (revised ed. 1992 & Supp. 1999)). Under North Carolina law, "a business entity and its assumed name do not

20

constitute two separate legal entities." James, 2021 WL 309115, at *5 (citing Liss v. Seamark Foods, Inc., 147 N.C. App. 281, 286, 555 S.E.2d 365, 369 (2001)).

Regarding the significance of an entity's name in a written instrument, the North Carolina Supreme Court has explained that

> [a] corporate name is essential, but the inadvertent or mistaken use of the name is ordinarily not material if the parties really intended the corporation by its proper name. If the name is expressed in the written instrument, so that the real name can be ascertained from it, this is sufficient; but if necessary, other evidence may be produced to establish what corporation was intended.

Troy & N.C. Gold Mining Co. v. Snow Lumber Co., 170 N.C. 273, 277–78, 87 S.E. 40, 42 (1915); see also id. at 277, 87 S.E. at 42 ("A misnomer does not vitiate, provided the identity of the corporation with that intended to be named by the parties is apparent.").

In similar fashion, a neighboring court (guided by analogous Virginia law) opted to excuse a misnomer when a corporation Marina One, Inc. d/b/a Joys Marina inadvertently identified itself in a contract as "Joys Marina, Inc." Marina One, Inc. v. Jones, No. 4:13CV117, 2015 WL 1538226, at *3–5 (E.D. Va. Apr. 3, 2015) (unpublished). In that case, the pertinent contract twice referenced Joys Marina, the corporations's actual assumed name (including in the signature line), despite misnaming the corporation (as Joys Marina, Inc.) in the header. Id. at *5. That court allowed the corporation to enforce the contract after noting

21

the signature by a representative of Joys Marina, the lack of dispute as to the non-existence of Joys Marina, Inc., and the absence of confusion by the contracting parties. See id. In contrast, when an agreement alternately identified one of the contracting entities ("Hudson Meridian Construction Group LLC") as "Hudson Meridian Construction Corp." and "Hudson Meridian Construction Group," Marlin, Inc. v. Cote, No. 112961/2007, 2008 WL 2185357, at *1 (N.Y. Sup. Ct. May 12, 2008) (unpublished) (emphasis added), another court discerned a factual dispute as to "whether [the signatory agent] was acting for a non-existent principal," id. at *3.

### B. Analysis

In support of the New Arbitration Motion, RPS has asserted that Plaintiff signed the Agreement (see Docket Entry 41, ¶¶ 17-19), an enforceable contract that includes within its scope all claims alleged in the Operative Complaint (see id., ¶ 9). Regarding "the venue issue," RPS has suggested that the Agreement "contemplate[s] arbitrati[on] in locations other than Charlotte" (id., ¶ 24), such that RPS will accommodate Plaintiff's choice of an alternate location, "as long as arbitration occurs in the state of North Carolina" (id.). (See also id., ¶ 23 ("[T]he geographic anomaly at issue . . . does not allow Plaintiff to choose whether to arbitrate, it only allows her to choose, along with [] Capital Cabaret, where to arbitrate.").) In response, Plaintiff has

22

insisted that the Agreement remains unenforceable on the grounds that (i) RPS did not sign the Agreement, and (ii) this Court lacks authority to compel arbitration in Charlotte. (See Docket Entry 42 at 10.) Plaintiff also has characterized enforcement of the Agreement's geographical restriction as impossible. (See id. at 14-16.) Replying to the argument that RPS never signed the Agreement, RPS has maintained that it does business as Capital Cabaret (Docket Entry 44 at 4), "Cap Cab" qualifies as "an abbreviation of Capital Cabaret" (id.), and "[t]he Capital Cabaret manager who filled out the paperwork hand-wrote 'Cap Cab' in the small space available on [the] Agreement" (id.).

As an initial matter, although RPS has invoked the presumption favoring arbitration (see, e.g., Docket Entry 41, ¶ 15), that presumption does not apply to the contract formation challenge that Plaintiff has raised. See Cary, 709 F.3d at 385 ("[A] court cannot apply any presumption in favor of arbitration unless there already exists an enforceable arbitration agreement between the parties."). On that question, RPS has proffered only a document executed by Plaintiff and an unidentified individual, purportedly on behalf of "Cap Cab." (See Docket Entry 41-1 at 2-4.) Notably, the Agreement mentions neither Capital Cabaret nor RPS. (See id.) The Court expects more clarity regarding the identity of the contracting parties, particularly in light of the "imperative that parties turn

23

square corners," <u>Rowland</u>, 993 F.3d at 260, in observing the formalities that necessarily precede contract formation.[5]

To the extent "Cap Cab" constitutes a legal entity, RPS has not identified any basis to allow RPS, as a non-signatory, to enforce the Agreement, <u>see</u> <u>International Paper</u>, 206 F.3d at 416–17. (<u>See</u> Docket Entry 41 at 1–7; Docket Entry 44 at 1–5.) For example, RPS has not shown that the signatory to the Agreement acted as an agent for RPS or that such agent possessed power to create binding contractual obligations for RPS. (<u>See</u> Docket Entry 41 at 1–7; Docket Entry 44 at 1–5.) RPS merely has contended (in its reply) that a "manager" for Capital Cabaret signed the Agreement and wrote "Cap Cab" instead of Capital Cabaret because of space constraints. (<u>See</u> Docket Entry 44 at 4.) However, "[a]rgument of counsel is not evidence." <u>Morrissey v. William Morrow & Co.</u>, 739 F.2d 962, 967 (4th Cir. 1984). Therefore, RPS has not supported the proposition that the signatory bound RPS, such that RPS could enforce the Agreement.

Insofar as "Cap Cab" qualifies as a non-existent legal entity (or abbreviation for Capital Cabaret, likewise a non-entity), RPS has failed to point to anything in the record establishing a connection between "Cap Cab" and RPS. (<u>See</u> Docket Entry 41 at 1–7; Docket Entry 44 at 1–5.) More specifically, RPS has not shown that

_____

    5  Without identifying the actual signatory, both PRS and RPS have characterized themselves (at times) as the proper entity to enforce the (same) Agreement.

"Cap Cab" constitutes RPS's assumed name. (See Docket Entry 41 at 1-7; Docket Entry 44 at 1-5.) Instead, RPS has relied on the similarity between its assumed name and "Cap Cab." (See Docket Entry 44 at 4.) Although some courts have allowed a misnamed entity to enforce a contract, RPS has not developed that argument here or explained how "the identity of [RPS] is reasonably clear or can be ascertained [from the Agreement]," 6 Fletcher Cyclopedia of the Law of Corporations § 2444 (Sept. 2021 update). (See Docket Entry 41 at 1-7; Docket Entry 44 at 1-5.) The Court resolves ambiguities in the Agreement against RPS, the purported drafter of the Agreement. See Silvers, 324 N.C. at 295, 378 S.E.2d at 25. Under the circumstances, RPS has failed to prove, with citation to the Agreement or other evidence of record, that Plaintiff and RPS agreed to arbitrate disputes between them. Accordingly, the Court will deny the Arbitration Motion.[6]

## II. New Certification Motion

## A. Relevant Legal Standards

### 1. Conditional Certification

Under the FLSA, an employee can bring an action for unpaid minimum and overtime wages on "behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). For FLSA

---

[6] In light of that determination, the Court declines to address the parties' arguments regarding whether the Court may enforce the Agreement's geographical restriction and/or compel arbitration in Charlotte.

purposes, "[p]utative [] members [of a collective action] are similarly situated . . . if they raise a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions." McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 469 (E.D.N.C. 2010) (internal quotation marks omitted). To become a party plaintiff, each "similarly situated" employee must "give[] his consent in writing to become such a party[,] and such consent [must be] filed in the court in which such action is brought." 29 U.S.C. § 216(b).

A two-year statute of limitations applies under the FLSA, except in cases of willful violations, which an employee may "commence[] within three years after the cause of action accrued," 29 U.S.C. § 255(a). For an individual claimant, a FLSA claim commences:

> (a) on the date when the complaint is filed, if [the claimant] is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
> (b) if such written consent was not so filed or if his name did not so appear — on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256. "Because the statute of limitations continues to run" until a claimant affirmatively opts in to the lawsuit, courts employ a two-stage certification procedure for FLSA collective

26

actions. <u>Houston v. URS Corp.</u>, 591 F. Supp. 2d 827, 831 (E.D. Va. 2008).

At the first stage, known as conditional certification, "the court determines whether the putative [collective action] members' claims are sufficiently similar to merit sending notice of the action to possible members of the [collective action]." <u>Adams v. Citicorp Credit Servs., Inc.</u>, 93 F. Supp. 3d 441, 453 (M.D.N.C. 2015) (internal quotation marks omitted).[7]  Although "not a 'rubber-stamp approach,'" the conditional-certification standard is "fairly lenient[:]" the plaintiff "need only make a relatively modest factual showing that a common policy, scheme or plan that violated the law exists." <u>Id.</u> (internal quotation marks and brackets omitted).  Moreover, when evaluating conditional certification, "the Court does not resolve factual disputes, decide substantive issues on the merits, or make credibility determinations." <u>Id.</u> at 454 (internal quotation marks omitted).

2. Notice

If a court decides to conditionally certify a collective action, the FLSA favors "court-controlled notice . . . to potential putative plaintiffs" as opposed to "unregulated solicitation

_____

7  The second stage, known as decertification, only occurs if (after a grant of conditional certification) a defendant, "usually after discovery is virtually complete[,]" moves to decertify the collective action.  <u>Long v. CPI Sec. Sys., Inc.</u>, 292 F.R.D. 296, 299 (W.D.N.C. 2013).  At that stage, "courts apply a heightened fact[-]specific standard to the similarly situated analysis." <u>Id.</u>

Case 1:20-cv-00134-LPA   Document 47   Filed 12/13/21   Page 27 of 35

efforts to secure joinder by those individuals." Id. at 456
(internal quotation marks omitted). Courts thus possess
"managerial responsibility to oversee the joinder of additional
parties to assure that the task is accomplished in an efficient and
proper way." Id. (quoting Hoffmann-La Roche Inc. v. Sperling, 493
U.S. 165, 170-71 (1989)). Such court-controlled notice should
neutrally and accurately advise potential members of the collective
action of their right to opt in without suggesting endorsement of
a plaintiff's claim. See Mebane v. GKN Driveline N. Am., Inc., 337
F.R.D. 479, 486 (M.D.N.C. 2020).

    With respect to means of notifying putative plaintiffs, some
courts have deemed "the distribution of notice 'via direct mail,
email and text messaging . . . eminently reasonable' against a
backdrop of 'a much more mobile society.'" Id. at 487 (quoting
Irvine v. Destination Wild Dunes Mgmt., Inc., 132 F. Supp. 3d 707,
711 (D.S.C. 2015)). However, this Court (per Judge Biggs) recently
declined to authorize reminder notices, absent demonstration of the
necessity of such notices. See id. (following Irvine). Finally,
to facilitate the notice and opt-in procedure, that same decision
ordered litigants to share certain contact and job-related
information regarding putative plaintiffs. See id. at 487–88
(ordering the defendant to produce, within 15 days, "the name, job
title, address, telephone number, email address, dates of

28

employment, location of employment, and shift assignment" for such individuals).

## **B. Analysis**

### 1. Conditional Certification

According to Plaintiff, the allegations of the Operative Complaint, coupled with Plaintiff's Declaration, satisfy the conditional-certification standard. (See Docket Entry 36 at 17–19.) For its part, RPS has relied on the existence of the Agreement as the sole grounds for denying the New Certification Motion. (See Docket Entry 39 at 1–7.)

As already discussed, the Agreement does not reflect contractual obligations between Plaintiff and RPS. Accordingly, RPS may not invoke the Agreement to compel arbitration, stay this action, or enforce any other provision (to include the Agreement's FLSA waiver). The Agreement thus provides no basis to deny the New Certification Motion.

Turning to the propriety of conditional certification, Plaintiff has demonstrated that Putative Plaintiffs qualify as "similarly situated," 29 U.S.C. § 216(b). In that regard, Plaintiff has made a modest showing that Putative Plaintiffs "were subject to a common practice of misclassification [as independent contractors]," Degidio v. Crazy Horse Saloon & Restaurant, Inc, No. 4:13CV2136, 2015 WL 5834280, at *19 (D.S.C. Sept. 30, 2015) (unpublished) (granting conditional certification). In particular,

29

Plaintiff has averred "that all dancers . . . signed contracts providing that they would not be paid any wages or provided overtime pay, but that all of their compensation would come from tips paid directly by customers," McFeeley v. Jackson St. Ent., LLC, Civ. Action No. 12-1019, 2012 WL 5928902, at *3 (D. Md. Nov. 26, 2012) (unpublished) (granting conditional certification). (See Docket Entry 36-1, ¶ 24.) However, Plaintiff's Declaration attests "that [RPS] disciplined [Plaintiff and other dancers], dictated their schedules, and otherwise treated them like employees," McFeeley, 2012 WL 5928902, at *3. (See Docket Entry 36-1, ¶ 21.) Plaintiff's Declaration further states that RPS never paid wages or overtime pay but collected fines and fees from dancers, see McFeeley, 2012 WL 5928902, at *3. (See Docket Entry 36-1, ¶¶ 28-29.) The Court discerns no basis to distinguish this action from "the vast majority of district courts in similar cases involving exotic dancers [that] have granted conditional [] certification," Degidio, 2015 WL 5834280, at *19 (collecting cases), especially given RPS's silence on the subject.

2. Notice

Plaintiff has characterized the Notice as "[a]ccurate and [i]nformative" (Docket Entry 36 at 19 (emphasis omitted)) and the Client Information Sheet as "necessary to provide . . . potential plaintiffs with notice of th[is] action" (id. at 20). Plaintiff has described the proposed 90-day opt-in period as "consistent with

established practice under the FLSA" (id. at 21).  Finally, Plaintiff has sought to distribute the Notice by email (see id. at 21-22), and has requested an order directing RPS to post the Notice and Consent Form "in a conspicuous location in the dressing room at . . . Capital Cabaret for the entire length of approved opt-in period" (id. at 22).  RPS has not objected to the Notice, Reminder Notice, Consent Form, or Client Information Sheet and has expressed no position as to posting the Notice and Consent Form at Capital Cabaret.  (See Docket Entry 39 at 1-7.)

Notwithstanding RPS's lack of response, the Court will grant only some of Plaintiff's requests.  Beginning with the Notice, Plaintiff has identified three years as the applicable statute of limitations (see Docket Entry 36-2 at 4) but also has suggested that Putative Plaintiffs may recover "improperly denied compensation only for time worked within the two or three years prior to the date [they] file [their] consent form" (id. (emphasis added)).  The first statement may mislead Putative Plaintiffs, insofar as the Court has not determined the statute of limitations in this action.[8]  The second statement, though accurate, could cause confusion when paired with the first statement.  For those reasons, Plaintiff must modify the Notice to clarify that the Court has not established the statute of limitations and that either a

_____

8  The Court also notes the filing of the Operative Complaint (Docket Entry 33) on March 4, 2021.

two- or three-year limitations period may apply.  See, e.g., York v. Velox Express, Inc., 524 F. Supp. 3d 679, 692 (W.D. Ky. 2021) ("[The] Notice must state that[,] under the FLSA, claims for damages are limited to two or three years immediately preceding each opt-in plaintiff's filing of consent, that the applicable statute of limitations has yet to be determined, and that the pendency of this suit does not stop the statute of limitations as to each opt-in plaintiff unless and until their consent is filed.").

As far as the length of the opt-in period, the Court discerns no reason to deviate from Plaintiff's request, particularly in light of RPS's failure to challenge it.  See Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 575 (D. Md. 2012) ("Notice periods may vary, but numerous courts around the country have authorized ninety[-]day opt-in periods for collective actions." (collecting cases)).  The Consent Form likewise appears acceptable.  Moreover, the Court authorizes distribution of the Notice and Consent Form via direct mail, email, and text message, given that "one's email address and cell phone number serv[e] as the most consistent and reliable method[s] of communication" in "a much more mobile society," Irvine, 132 F. Supp. 3d at 711.

Turning to the proposed requirement that RPS post the Notice and Consent Form in the Capital Cabaret dressing room, the Court deems such proposal reasonable for the reason stated by a

neighboring court in authorizing such posting. _See_ _Gardner v._ _Country Club, Inc._, No. 4:13CV3399, 2015 WL 7783556, at *11 (D.S.C. Dec. 3, 2015) (unpublished) (recognizing potential ineffectiveness of notice by mail, "given the admittedly transient nature of the [exotic dance] industry"); _see also_ _Williams v. GGC-Baltimore, LLC_, No. 1:19CV274, 2019 WL 2058903, at *3 (D. Md. May 8, 2019) (unpublished) (ordering club to post notice); _Degidio_, 2015 WL 5834280, at *24 (same).

With respect to the Reminder Notice, Plaintiff has failed to offer any justification for such notice. (_See_ Docket Entry 36 at 19-23.) Courts have declined to allow reminder notices under similar circumstances. _See_ _Mebane_, 337 F.R.D. at 487 ("The Court thus finds no basis for permitting an additional mailing and finds, as other courts have, that 'additional notice is [unnecessary] and . . . may take on an element of harassment.'" (quoting _Irvine_, 132 F. Supp. 3d at 711)); _Williams_, 2019 WL 2058903, at *3 (denying request "absent a showing that some special circumstance necessitates multiple notices"). Accordingly, the Court denies Plaintiff's request to send the Reminder Notice.

Finally, regarding the Client Information Sheet, this Court (per Judge Biggs) previously has compelled a defendant in a FLSA action to produce "the name, job title, address, telephone number, email address, dates of employment, location of employment, and shift assignment of all employees that fall within the potential

33

collective action," <u>Mebane</u>, 337 F.R.D. at 488; <u>see also</u> <u>id.</u> at 487 (authorizing notice by text message, in part because employer did not collect or verify personal email addresses of employees). However, neighboring courts have denied requests for compelled production of telephone numbers absent "special circumstances . . . necessitat[ing] such production." <u>Williams</u>, 2019 WL 2058903, at *2 (citing <u>McFeeley</u>, 2012 WL 5928902, at *5 n.2). On that score, Plaintiff has argued that "a large portion of employees who worked for [RPS] during the relevant period may have moved since their employment with [RPS] and thus further information is needed to locate them for delivery of notice." (Docket Entry 36 at 20-21.) Under the circumstances, the Court will order RPS, by January 3, 2022, to produce in a searchable, electronic format, "an updated listing of the names, last known mailing addresses, last known home and cellular phone numbers, email addresses, and dates of employment of all exotic dancers who worked for [RPS] at any time during the period from February 2017[] to the present" (Docket Entry 35-1 at 1).

### CONCLUSION

Because RPS neither signed the Agreement nor identified a basis to enforce the Agreement as a non-signatory, the New Arbitration Motion falls short. Plaintiff has established that Putative Plaintiffs qualify as "similarly situated," such that the Court will conditionally certify this matter as a collective

34

action, provide for court-authorized notice, and order RPS to share certain information about Putative Plaintiffs.

**IT IS THEREFORE ORDERED** that the New Arbitration Motion (Docket Entry 41) is **DENIED.**

**IT IS FURTHER ORDERED** that the New Certification Motion (Docket Entry 35) is **GRANTED IN PART AND DENIED IN PART**, such that Plaintiff must revise the Notice in a manner consistent with this Order; the opt-in period shall last until March 13, 2022; Plaintiff may distribute the Notice and Consent Form via first-class mail, email, and text message; and Plaintiff may not utilize the Reminder Notice.

**IT IS FURTHER ORDERED** that, on or before January 3, 2022, RPS shall post the (amended) Notice and Consent Form in the Capital Cabaret dressing room and, by January 3, 2022, shall provide Plaintiff with the names, last known mailing addresses, last known home and cellular phone numbers, email addresses, and dates of employment of all exotic dancers who worked for RPS at any time during the period from February 2017 to the present.

This 13th day of December, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld
United States Magistrate Judge**

35